1

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF ILLINOIS


SALIK N. ABDULLAH           )      16-CV-920
                            )
                            )
          Plaintiffs,       )
                            )
     Vs.                    )      East St. Louis, Illinois
                            )      February 26, 2018
WEXFORD HEALTH SOURCES,     )
Et al.,                     )
          Defendants,       )

               TRANSCRIPT OF MOTION HEARING,
                  (HELD BY VIDEOCONFERENCE)
          BEFORE THE HONORABLE DONALD G. WILKERSON,
              UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiffs:         Greensfelder, Hemker & Gale
                            By:  Molly R. Batsch
                            10 South Broadway
                            St. Louis, MO  63102-1747

For the Defendants:         Cassidy Schade LLP
                            By:  Timothy P. Dugan
                            100 North Broadway, Suite 1580
                            St. Louis, MO  63102

                            Office of the Attorney General
                            By:  Jason R. Adams
                            500 South Second Street
                            Springfield, IL  62701

Court Reporter:             Barbara Kniepmann
                            750 Missouri Avenue
                            East St. Louis, IL  62202

Proceedings recorded by mechanical stenography, transcript
produced by computer.
```

2

```
 1        (Whereupon the following proceedings were held in open
 2    Court via videoconference call.)
 3             COURTROOM CLERK:  The matter of Salik Abdullah versus
 4    Wexford Health Sources, et al., 16-920, is called for Hearing
 5    on Motion for Preliminary Injunction.  Will the parties
 6    identify themselves for the record?
 7             THE COURT:  For Mr. Abdullah this morning we have?
 8             MS. BATSCH:  Molly Batsch, Your Honor.
 9             THE COURT:  All right, Miss Batsch, good morning.
10    For IDOC defendants who do we have?
11             MR. ADAMS:  Jason Adams, Your Honor.
12             THE COURT:  For the Wexford defendants?
13             MR. DUGAN:  Tim Dugan, Your Honor.
14             THE COURT:  Mr. Dugan, good morning.  For the record,
15    we have folks by video this morning.  Mr. Abdullah, are you
16    there?
17             MR. ABDULLAH:  Yes, right here.
18             THE COURT:  Very good.  Can you hear me and see me?
19             MR. ABDULLAH:  I can't see you, but I can hear you.
20             THE COURT:  The vision.  I'm sorry, I got you.  But
21    you can hear me well?
22             MR. ABDULLAH:  Very well.
23             THE COURT:  Okay, very good.  We also have other
24    folks in the room there.  Are these witnesses?
25             MR. DUGAN:  Yes, Your Honor.
```

1          THE COURT:  Can you see me and hear me?  For the

2    record, why don't you tell me who we have there and we'll get

3    it on the record.

4          MR. BLACKBURN:  Max Blackburn, administrative

5    assistant one.

6          THE COURT:  You say Max?  What was the last name?

7          MR. BLACKBURN:  Blackburn, B L A C K B U R N.

8          THE COURT:  Mr. Blackburn, good morning.

9          DR. ZHATZ:  Dr. Merrill Zahtz, medical director of

10   Dixon.

11         THE COURT:  Dr. Zahtz, good morning.  And third?

12         MS. THIELEN:  Rebecca Thielen, nursing supervisor for

13   the state.

14         THE COURT:  Rebecca -- what was the last name, ma'am?

15         MS. THIELEN:  T H I E L E N.

16         THE COURT:  Thank you.  Good morning.

17         All right, very good.  We're here this morning for a

18   hearing on Mr. Abdullah's motion that he had before the Court

19   for preliminary injunction.

20         Just for the record, and if I get any of this wrong

21   you guys chime in, but Mr. Abdullah, when he filed this

22   motion, was housed at a different institution than he is now.

23   When the Court dealt with that motion, we asked the plaintiff

24   to determine if the motion was moot because he had been

25   transferred and plaintiff filed a motion addressing the issue

4

1    stating that it was not moot, that it was a system wide

2    problem, therefore, the issues that Mr. Abdullah had

3    complained of have not been resolved.

4          The defendant filed, Defendant Wexford, filed a

5    Notice of Compliance -- oh, no, I am sorry, IDOC filed Notice

6    of Compliance and also the Wexford defendants filed a Notice

7    of Compliance.  The Notice of Compliance basically, and I'll

8    take the Wexford one first because it is set out in more

9    detail, set out what the defendants -- their position on

10   Mr. Abdullah's care, as did the IDOC defendants.

11         Now, I do want to -- Miss Batsch, you tell me if I

12   have this right.  I looked at your brief, and from my reading

13   of the brief, the issues that I believe are before the Court

14   are the ineffective pain medication, the medical treatment and

15   the following of -- one of the things you asked for is

16   telescopic and tinted lenses and reasonable accommodation.

17   There was also in your brief -- you also asked for some

18   things, ADA compliant single man cells, injunctive relief

19   compelling defendant to grant Mr. Abdullah access to ADA

20   compliant gym, those types of things.  I just want to know,

21   what is it about those that makes them ripe for preliminary

22   injunction?  Now the medical treatment I get, the pain

23   medication I get, but I am struggling with the gym and the

24   single man cell.  Go ahead.

25         We're all seated.  Let's just stay seated this

5

1    morning.  Hold on.  Wait, I want to swing the camera over so

2    Mr. Abdullah can hear you and see you.

3          MS. BATCH:  To address Your Honor's question, it is

4    the plaintiff's position as articulated in the First Amended

5    Complaint that was recently filed that the Defendants IDOC and

6    Wexford, in addition to having a system wide policy and

7    practice of favoring cost savings over the provision of

8    adequate medical care, have the following policies:  One, that

9    they are favoring cost savings over the provision of

10   reasonable accommodations as they are required to give under

11   the ADA, and two, they have a policy and practice of

12   systematically denying reasonable accommodations to inmates at

13   IDOC facilities that are administered by Wexford.

14         THE COURT:  That is not my question.  My question is,

15   is what we're dealing with this morning, for want of a better

16   term, is something that can't wait until the conclusion of the

17   lawsuit.

18         MS. BATCH:  Sure.

19         THE COURT:  What I am trying to figure out is what is

20   your position on why these things are ripe for injunctive

21   relief at this point of the litigation and not at the

22   conclusion of the litigation.

23         MS. BATSCH:  Sure.  So why is immediate relief

24   necessary, and it is the plaintiff's position that immediate

25   relief is necessary with regard to the reasonable

1    accommodations requested for a couple of reasons, Your Honor.

2    First off, Mr. Abdullah suffers from ankylosing spondylitis.

3    He also suffers from rheumatoid arthritis, both of which

4    Courts have concluded are serious medical conditions.  In the

5    1980s, actually, the prison system issued recommendations that

6    he have at least an hour to perform certain exercises that

7    they recommended that he do so his ankylosing spondylitis

8    would not continue to result in further deterioration.  He has

9    been repeatedly denied the opportunity to do that by virtue of

10   not having access to an ADA compliant gymnasium, or in the

11   alternative not having the room within his cell to perform the

12   exercises.  Each day that goes by that he is not able to

13   perform those exercises, further deterioration occurs.  That

14   was actually supported by Joann Reagan, who was the registered

15   nurse consultant who issued an opinion in support of the

16   plaintiff's motion for preliminary injunction.

17          With regard to the request for single man cell, it is

18   the plaintiff's position that as soon as the plaintiff seeks

19   relief, it happened at Pinckneyville, it is anticipated to

20   happen at Dixon, there is retaliation on the part of the

21   prison and as soon as the plaintiff filed the lawsuit at

22   Pinckneyville, he was placed within a cell with a very

23   dangerous inmate.  The inmates he has been placed with, and

24   recognizing, of course, there are dangerous inmates at prisons

25   in general, but the inmates that he was placed with on a

1    repetitive basis are some of the most dangerous inmates that

2    are available at a particular institution and if that

3    retaliation continues by virtue of Mr. Abdullah's medical

4    conditions, he is unable to defend himself and not only is he

5    unable to defend himself, but any altercation with his cell

6    partner would surely result in additional medical problems and

7    exacerbation of his current medical condition.  So it is our

8    position, Your Honor, that unless we obtain this relief right

9    now, Mr. Abdullah continues to be at a severe safety risk.

10            THE COURT:  All right, okay.  This is your motion.

11   The Court is in receipt of your brief addressing the issues.

12   Is there any evidence that you want to present this morning?

13            MS. BATSCH:  Well, I did have one question for the

14   Court.  It was my understanding from -- Miss Howard had called

15   the Court and spoken with the clerk and I believe that she

16   mentioned that it was her understanding that we were not

17   actually addressing the merits of preliminary injunction

18   hearing, but rather we were addressing the legal issues,

19   specifically the legal issue of whether preliminary relief was

20   still on the table, so, you know, whether the preliminary

21   injunction had been moot or not.  So at this point plaintiff

22   is not prepared to present evidence in support of injunctive

23   relief.  Plaintiff is only prepared to address the issue of

24   whether injunctive relief is ripe for review or moot.

25            THE COURT:  Let me ask you a question.  Is it your

8

1   position -- as I said, I have your brief.  Is it your position

2   that you would have other evidence to present that is not in

3   the brief?

4           MS. BATSCH:  Yes.  It is plaintiff's position that in

5   addition to calling the plaintiff to testify as to the current

6   conditions at Dixon, we would also present testimony from

7   Joann Reagan and possibly an additional physician.

8           THE COURT:  All right.

9           MS. BATSCH:  I apologize, Your Honor, if there was

10   any misunderstanding.

11           THE COURT:  That's okay.  What it looks like in order

12   to have, and this is my suggestion so that we don't have to

13   reconvene this hearing, because it looks like you guys are

14   prepared to present testimony on the underlying issue with

15   your witnesses in the room, correct?

16           MR. DUGAN:  Yes, sir.

17           THE COURT:  Well, here is my thought process, and I

18   apologize for the confusion, but instead of reconvening the

19   hearing, if she has additional evidence would there be any

20   objection to the Court accepting it by way of affidavit for

21   purposes of this hearing only?

22           MR. ADAMS:  No, Your Honor.

23           THE COURT:  Not from the IDOC.  What about you,

24   Mr. Dugan?

25           MR. DUGAN:  I think we would be okay with that as

1   long as we were given an opportunity to respond to it.

2          THE COURT:  Any objection to that?

3          MS. BATSCH:  No.

4          THE COURT:  Okay, very good.  Well, so why don't we

5   take up the issue and I do have the legal issue here of

6   whether Mr. Abdullah's claim is moot.  Any other arguments you

7   wish to present on that in addition to what is in your brief?

8          MS. BATSCH:  No.  I would like to just clarify the

9   issues.  Plaintiff does recognize, as is indicated in the

10  briefing by the Wexford defendants as well as the IDOC

11  defendants, that he has received a referral to a cardiologist.

12  It is plaintiff's position that referral was only given after

13  he experienced repeated shortness of breath and cardiac

14  incidents that led him to the hospital, so it continues to be

15  plaintiff's position that a specialist referral is basically a

16  policy and practice that is maintained at Wexford and IDOC.  A

17  specialist referral is repeatedly denied until that time when

18  the inmate's health condition becomes so severe that it

19  threatens his life.  So for that reason, he has continued to

20  be denied a referral to a rheumatologist.

21          In addition, Your Honor, I would note that we have

22  confined the briefing to those issues that are still before

23  the Court.  So to the extent that injunctive relief is no

24  longer being requested by virtue of the plaintiff moving to

25  Dixon, we have not included that in our brief.

1      THE COURT:  All right, very good.  Do either of you

2  guys wish to be heard on the issue of mootness?

3      MR. ADAMS:  Yes, Your Honor.  It would be defendant's

4  position that the issue of injunctive relief is moot since

5  plaintiff has been moved to a different facility.  Plaintiff's

6  complaint and amended complaint is replete with references,

7  specific references, to Pinckneyville and Pinckneyville staff,

8  how he was not given certain treatment by Dr. Shah and then

9  subsequently how he was not given specific treatment by Dr.

10 Scott.

11      Additionally in terms of his sight and shower related

12 services, it is specifically addressed again to Pinckneyville.

13 Plaintiff alleged that he was not given access to ADA

14 supported shower within Pinckneyville, nor was he given access

15 to his glasses because specific officers at Pinckneyville had

16 confiscated the glasses for safety and security purposes.

17 Well, that motion for injunctive relief is mooted by plaintiff

18 moving to a different correctional facility that has

19 completely different individuals.  In fact, Warden Lashbrook

20 is a defendant in the case.  She was a former warden at

21 Pinckneyville.  She's not the warden at Dixon.

22      Now IDOC can be responsible for purposes of

23 injunctive relief in terms of counts under the ADA and the RA,

24 but there are no specific allegations to Dixon under the

25 American With Disabilities Act or the Rehabilitation Act that

11

1   would put Dixon on notice that there are constitutional

2   violations by plaintiff.  There are no specific complaints.

3   So IDOC comes to the position of having to defend itself where

4   it is not given notice, especially in terms of the individuals

5   at Dixon, of what the problems were.

6          THE COURT:  Well, here is the issue.  Go ahead.  I

7   didn't mean to cut you off.

8          MR. ADAMS:  Additionally, Your Honor, according to

9   the Court's ruling on exhaustion, there are two counts in

10  front of this Court right now.  Count 1 is related to Dr. Shah

11  and whether he properly treated plaintiff for his medical

12  conditions at Pinckneyville.  The second count is against IDOC

13  under the ADA and the Rehabilitation Act for events that

14  happened at Pinckneyville.  Those are the two issues in front

15  of the Court, and the issues in terms of the ADA and RA are

16  for his sight and shower related services.  The Court has

17  specifically confined and narrowed those issues, both in its

18  memorandum and order and the Court's most recent order on the

19  issue of exhaustion.  Those are the issues before the case

20  right now.  It's not an issue of a one man cell.  There is not

21  even a claim under the ADA for living conditions in terms of

22  cell, excuse me, assignments, and it is not something that is

23  in front of this Court right now.

24          Defendants find themselves wondering how to defend

25  themselves with all of these additional allegations that

1    haven't been -- that are outside of the scope of what we're

2    talking about.

3          THE COURT:  Okay.  Your point is taken on the things

4    that are outside the complaint, however, here is the issue for

5    me.  Taken to the extreme, and recognizing that I am taking it

6    to the extreme, okay, taken to the extreme, all IDOC as a

7    defendant would have to do is move a defendant and it doesn't

8    matter what you do after that because he is not at the same

9    prison.  It is kind of like in criminal law there is an anti

10   shoveling provision that stops the State or Government

11   entities from hiding a guy, moving him from here to there.  So

12   I mean -- so based on what you said, basically all they got to

13   do is move him.  All the IDOC has to do is move him and it

14   cuts off any claim he has for injunctive relief, whether or

15   not they move him somewhere where the same conditions exist,

16   he has to file a new lawsuit.  I'm just asking.

17         MR. ADAMS:  Sure.  No, Your Honor, I would respond

18   there is no specific allegation that continuing specific,

19   excuse me, violations exist at Dixon.  Again, plaintiff's

20   complaint is replete with references to Pinckneyville staff

21   and what happened at Pinckneyville.  So, you know, to allege

22   that somehow theoretically the same conditions exist is not

23   just and fair to the defendants, Your Honor, and it sets upon

24   a whole bunch of hypotheticals that there is no evidence that

25   actually exist.

1        So, you know, defendants would simply state if

2   plaintiff's complaints had been something like, and plaintiff

3   has been incarcerated since 1978, Your Honor, but if he said

4   at all of the institutions I have been incarcerated at, IDOC

5   has a systematic policy of denying me X, Y, Z things, I would

6   get that argument, but that is not the case.

7        THE COURT:  If he was incarcerated since 1978 he has

8   a lot of experience with IDOC.

9        MS. BATSCH:  If Your Honor wouldn't mind if I briefly

10  responded?

11       THE COURT:  Sure.

12       MS. BATSCH:  As far as the fairness issue, the

13  plaintiff presents that the same fairness issue is present for

14  the plaintiff, Your Honor.  If you might recall the procedural

15  posture of the case, when last we met before the Court, I

16  believe plaintiff was either at Pinckneyville still or had

17  just been transferred.  At that point, the exhaustion issue

18  was on the table.  We couldn't do any discovery.  We had filed

19  a request to file an amended complaint, but that had not been

20  granted.  That was only recently granted, so for defendants to

21  argue that plaintiff has not provided the Court with

22  allegations relevant to Dixon, plaintiff has not had any

23  opportunity to do so.  You know, we received authorization to

24  file the exact amended complaint that we filed while plaintiff

25  was still at Pinckneyville.  So at the very least, plaintiff

1    should be given the opportunity to seek further amendment to

2    include the allegations specifically relevant to Dixon,

3    however, even if the Court denies that opportunity, it is

4    plaintiff's position that he has adequately pled allegations

5    to involve both the IDOC and Wexford and to allege that they

6    are engaging in systematic policies and conduct that the

7    violations continue at Dixon.

8              Specifically, if I could direct the Court to page two

9    of six of our briefing, there are specific paragraphs to which

10   we cite in the amended complaint where plaintiff alleges

11   systematic policies on the part of the IDOC and Wexford as far

12   as cost savings that apply across all their facilities.  That

13   is the exact same allegation that the Seventh Circuit found in

14   *Lehn* was sufficient to avoid plaintiff's claims being moot, so

15   in *Lehn* the exact same allegations were present.  Basically

16   the plaintiff alleged for the first time actually in

17   connection with a similar hearing that we have today, that he

18   was recently transferred to a different facility, that the

19   smoking policy that was applied in his old facility was

20   similarly applied at his new facility and that he was still

21   suffering from that policy.  That is exactly what plaintiff

22   has alleged in the amended complaint in those paragraphs that

23   are cited to in the briefing that the IDOC and Wexford

24   maintains a system wide policy and practice of favoring cost

25   savings over appropriate medical care and the provisions under

1   reasonable accommodations under the ADA and by virtue of that

2   policy and practice he is still suffering the exact same

3   problems he suffered at Pinckneyville at Dixon.  That is even

4   born out by the exhibit which shows that, once again,

5   plaintiff has been specifically prescribed several different

6   pairs of eye glasses and other devices to help him to see and

7   notwithstanding orders from the defendant's own physician, Dr.

8   Zahtz, granting all of the recommendations, it has been four

9   months and the defendants have not provided him with those eye

10  glasses.

11         Now I'm sure the defendants will testify to the fact

12  that there are policies and practices they have to go through

13  at the prison to do that.  Frankly, Your Honor, he hasn't had

14  the prescribed eye glasses and devices to enable him to see

15  since 2015.  How long are we going to allow the defendants to

16  continue to violate his rights and ignore their own

17  recommendations?

18         THE COURT:  Anything else?

19         MR. ADAMS:  Just to respond very briefly.  Plaintiff

20  was given two sets of eye glasses and that was included in the

21  response to their temporary injunction on two different

22  occasions.  So he was given eye glasses I know for certain on

23  October 3rd of 2016 and also given eye glasses for a period of

24  time, I'm not sure but I know it is in the record months

25  before.  So I don't know the status of his eye glasses right

 1    now, but I guess just as a general reputation, Your Honor,

 2    plaintiff is asking for permanent injunctive relief right now

 3    and he is side stepping the process of having a jury and going

 4    through a motion proceeding to do an in run on permanent

 5    injunctive relief.  Temporary injunction or preliminary

 6    injunction is to maintain the status quo, not to provide the

 7    plaintiff the relief that he ultimately seeks.  The Seventh

 8    Circuit has been clear on that.

 9              THE COURT:  Okay.  Mr. Dugan?

10              MR. DUGAN:  Your Honor, I would only add as I point

11    out in the brief, Dr. Shah is at Robinson, no longer at Dixon.

12    Dr. Scott is no longer employed by Wexford.  There is nothing

13    either of them could do even if ordered to do so.  Wexford was

14    recently dismissed on merit review.  They were recently

15    brought back in with the first amended complaint.  They have

16    not yet been served, so they are not technically a party to

17    this lawsuit.  At this point even if you told me to, there is

18    nothing I could do about it.  In addition to that, if you look

19    at all of the -- the plaintiff contends the same problems he

20    was having at Pinckneyville continued through to Dixon.  If

21    you look at the medical records that we provided in our notice

22    of compliance, Document 116, and the medical care that is

23    outlined in there, Mr. Abdullah is getting a ton of medical

24    care.  He is getting ECGs, going to the cardiologist, getting

25    narcotic like pain medication for his arthritis.  There may be

1    one or two issues that have not been directly addressed

2    because we just got into this.  This was Miss Kinkade's case

3    and she is out on maternity leave, but he is getting a ton of

4    care at Dixon and by no means being ignored.

5            THE COURT:  Okay.  Is there any other -- we're kind

6    of disjointed because of the way that you understood the

7    hearing would go.  So this is your motion.  Is there any

8    evidence you wish to present from Mr. Abdullah today?

9            MS. BATSCH:  Your Honor, we received these medical

10   records on Friday evening, so I mean without having them

11   reviewed by our experts it is kind of difficult to present

12   additional evidence.  The only thing I would add would be that

13   the eye glasses that Mr. Abdullah has been provided are not

14   what was prescribed.  You know, he has repeatedly been denied

15   what was specifically recommended and prescribed for less

16   costly alternatives, going along with the same cost saving

17   policy and practice we have already cited to.  I wanted to

18   clarify.  We're not seeking injunctive relief against Dr.

19   Scott and Dr. Shah.  We recognize they can't provide

20   injunctive relief at Pinckneyville.  They are not even at

21   Pinckneyville anymore.  We would ask injunctive relief

22   specifically as to the IDOC and Wexford.  And to the extent

23   that the warden at Dixon would be required to get involved in

24   the injunctive relief requested, we would ask the Court to

25   substitute Defendant Lashbrook for the warden at Dixon whose

1   name I don't even know at this point.

2        THE COURT:  What about -- Mr. Dugan says Wexford is

3   not in the case yet at this point.  Is it your position if

4   there was an injunction against IDOC that would cover Wexford

5   at this point?

6        MS. BATSCH:  The procedural posture of the case is a

7   little bit -- it is kind of preventing us from doing much at

8   this point because, you know, we were given the opportunity to

9   file the amended complaint at the same time that we had to

10  brief the preliminary injunction piece of this, so, you know,

11  to some degree the plaintiff's hands were tied as to that

12  issue.  We recognize that as of, you know, the date that the

13  amended complaint or the motion was filed, Wexford was not

14  actually in this case, but, you know, we would represent that

15  we have done everything we can as the plaintiff to include

16  those defendants in line with the Court's original case

17  management conference.

18        MR. ABDULLAH:  Excuse me, may I say something please?

19        THE COURT:  One moment, Mr. Abdullah.  Mr. Abdullah,

20  absolutely you can say something.  Your lawyer is here and let

21  me defer to your attorney at this point.

22        MS. BATSCH:  So Mr. Abdullah, I would prefer that

23  when we have the opportunity to submit an affidavit, you

24  present any testimony you might have in that manner so that we

25  can present that along with our expert testimony.  That would

1    be my recommendation.

2              MR. ABDULLAH:  That is fine.  That is fine.

3              THE COURT:  All right.  Is there anything -- I know

4    you guys had witnesses.  Is there anything -- I have your

5    notice of compliance.  If there is evidence you wish these

6    witnesses to give, that will be fine, or if you would like

7    I'll give you the same opportunity I gave to the plaintiff to

8    submit your evidence by way of affidavit.  It is kind of up to

9    you.

10             MR. DUGAN:  That is fine by me, Your Honor.

11             THE COURT:  Which one is fine?

12             MR. DUGAN:  Affidavit.

13             MR. ADAMS:  I would prefer actually if defendants

14    could offer witness testimony right now as long as they are

15    there.

16             THE COURT:  These your witnesses?

17             MR. ADAMS:  Two of them are, yes, Your Honor.

18             THE COURT:  The third is whose witness?

19             MR. DUGAN:  Dr. Zahtz is mine.  As long as he is here

20    we can knock it out.

21             THE COURT:  This is your case, not mine.

22             MS. BATSCH:  Just one point of clarificatioin, Your

23    Honor.  Like we said before, plaintiff is not seeking

24    injunctive relief with regard to cardiologists, so I don't

25    know if we're -- most of the stuff in the Wexford and IDOC

20

1   responses addresses injunctive relief that was previously

2   sought and is not currently sought.  I don't know if we could

3   narrow the issues here, but I am offering to try to do that.

4           THE COURT:  Why don't you narrow the issues?  Go

5   ahead.  As far as you are concerned, what are you asking for?

6           MS. BATSCH:  As far as the plaintiff is concerned,

7   currently the injunctive relief currently being sought are,

8   first, that plaintiff be referred to a specialist in the area

9   of rheumatology and that the defendants be compelled to follow

10  the rheumatologist's recommendations.  The second request for

11  relief, and I am tracing the A, B, C, D in the motion

12  submission, but the second request for injunctive relief is

13  that plaintiff be provided with all of the devices that the

14  low vision specialist, John Russell, Dr. John Russell

15  recommended and Dr. Zahtz approved.  The third request is that

16  plaintiff be given access to an ADA compliant gymnasium, or in

17  the alternative that if an ADA gymnasium is not available,

18  we're not trying to be unreasonable and we don't expect Dixon

19  to construct one, but we would ask that in the alternative

20  plaintiff be given access to ankle and wrist weights in his

21  cell for at least an hour per day to perform the exercises

22  that the IDOC previously said that he needed to perform to

23  prevent further deterioration.  Then the fourth request would

24  be that plaintiff be given access to either ADA compliant or

25  single man cell assignment, both to enable him to, you know,

1    due to his visual impairments, to not constantly run into his

2    roommate and cause further problems and potential altercations

3    there, but also to allow him to perform the exercises he needs

4    to perform in his cell and to prevent serious injury that

5    would result if he was attacked in his cell.

6         THE COURT:  Okay.

7         MR. ADAMS:  Your Honor, I could have one of the

8    witnesses testify in terms of specialist's recommendations and

9    I think we have those outlined as well.  I will not have the

10   witnesses address ADA compliant gymnasium or one man cell as

11   this Court found repeatedly those issues are not part of the

12   viable claims that are in front of this Court today.

13        THE COURT:  Okay.  What about the -- am I saying it

14   right -- rheumatologist?

15        MS. BATSCH:  Rheumatologist.

16        MR. ADAMS:  IDOC would not have the authority to

17   instruct or refer plaintiff to a rheumatologist.  That would

18   be the position or the duties of a doctor.  IDOC as an entity

19   does not make medical referrals.

20        MS. BATSCH:  Your Honor, if that is the case

21   plaintiff would represent that would fall to the Wexford

22   defendants.

23        MR. DUGAN:  It is my understanding from the e-mail I

24   got from Dr. Zahtz over the weekend that a rheumatologist

25   referral is also already in the works.

22

1          THE COURT:  Is Dr. Zahtz there?  Why don't you let

2     him tell me that.

3          DR. ZAHTZ:  I can't hear you.

4          THE COURT:  Can you hear me now?

5          DR. ZAHTZ:  I can hear you.  I can't hear the

6     attorney.

7          THE COURT:  Let me swear him in.

8          DR. MERRELL ZAHTZ, DEFENDANT'S WITNESS, AFFIRMED

9                     DIRECT EXAMINATION

10    Questions by Mr. Dugan:

11    Q.    Can you identify yourself for the Court please, Doctor?

12    A.    Merrel Zahtz.

13    Q.    And very briefly, Doctor, can you give the Court a

14    thumbnail sketch of your medical education and professional

15    background?

16    A.    Yes.  I receive medical degree in the Autonomous

17    University of Guadalajara, Mexico in 1975.  I did internship

18    and residency at Mt. Sinai Hospital in Chicago and I was in

19    private practice for a little over 30 years and since then I

20    recently come to Dixon Correctional Center to be the medical

21    director.

22    Q.    Thank you, Doctor.  Doctor, have you had chance to

23    review Mr. Abdullah's medical chart?

24    A.    Somewhat, yes.

25    Q.    The more recent portions of it?

1    A.    Yes.

2    Q.    With respect to the referral to a rheumatologist, what

3    is the status of that?

4    A.    That is pending the collegial review in order to be

5    approved by Wexford collegial review specialist.

6    Q.    When was that request put in to the collegial review,

7    roughly?  We don't need an exact date, but within the last

8    week, last month?

9    A.    Within the last one to two months.  I don't remember

10   exactly.

11   Q.    When do you expect that issue to be taken up at

12   collegial review, Doctor?

13   A.    Actually, it was supposed to be for today, this

14   afternoon.

15             MR. DUGAN:  Okay, thank you.

16             THE COURT:  Why don't you file notice -- today is

17   Monday the 26th.  Why don't you -- can you file something by

18   Friday?

19             MR. DUGAN:  Yes, sir.

20             THE COURT:  File something by Friday, whether or not

21   that -- notice as to whether that happened.  That would take

22   -- at least it would be your position or would follow the

23   recommendations still be on the table.

24             MS. BATSCH:  Following the recommendations would

25   still be on the table.  The referrals are appreciated, but as

24

1    we saw with the low vision specialist, they are often not

2    followed.

3            THE COURT:  All right.  Well, okay.  Anything else --

4    you wanted your witnesses, correct?

5            MR. ADAMS:  Yes, sir.  Yes, Your Honor.

6            THE COURT:  Who do you want first?

7            MR. ADAMS:  Miss Thielen, would you mind stating your

8    name and position for the Court?

9            THE COURT:  Miss Thielen, raise your right hand and

10   swear or affirm.

11            REBECCA THIELEN, DEFENDANT'S WITNESS, SWORN

12           MR. DUGAN:  Your Honor, can we discharge Dr. Zahtz

13   from the proceeding?

14           THE COURT:  Do you have any questions for Dr. Zahtz?

15   I didn't ask.

16           MS. BATSCH:  I should have asked -- I would like to

17   ask him a couple of questions with regard to the eye glasses

18   portion of this.

19           THE COURT:  Miss Thielen, hold on.  We kind of got

20   out of order here.

21           All right, Dr. Zahtz, the plaintiff's attorney wants

22   to ask you a few questions.

23           DR. ZAHTZ:  Sure.

24

25

25

CROSS EXAMINATION

1

2    Questions by Ms. Batsch:

3    Q.    Hi, Dr. Zahtz.  This is Molly Batsch representing the

4    plaintiff.  How are you?

5    A.    Okay.

6    Q.    I just have few quick questions for you.  It is my

7    understanding that plaintiff was referred to Dr. John Russell,

8    who was a low vision specialist, in August of 2017.  Is that

9    your understanding as well?

10   A.    Yes.

11   Q.    Okay.  In connection with that visit, plaintiff was

12   recommended to be provided with five different devices to

13   enable him to see, including a video magnifier for printed

14   material, ten times binocular lenses for distance viewing,

15   permanently dark tinted lenses for glare, a long walking cane

16   and talking watch or clock to treat and accommodate his

17   anterior uveitis.  Is that your understanding as well, Dr.

18   Zahtz?

19   A.    Yes.

20   Q.    For your convenience, I know you have a lot of records

21   in front of you, but I am referring to a copy of Dr. Russell's

22   October 5th of 2017 recommendation.  It is also my

23   understanding that on the bottom of that recommendation you

24   ordered all of Dr. Russell's recommendations to be followed,

25   is that correct?

1    A.    I put them in the order to be processed through the

2    central supply.  That's correct.

3    Q.    Okay.  And I am not sure if you have this information

4    or not, but it is my understanding that to date the only

5    recommendation that has been followed is the provision of the

6    long walking cane.  The other four things that were

7    recommended by the low vision specialist have not yet been

8    provided to Mr. Abdullah, is that correct?

9    A.    I wouldn't know.

10   Q.    Okay.  Can you let me know who would know that at the

11   facility?

12   A.    Mr. Abdullah would know.

13   Q.    Anyone else?

14   A.    No.  I mean central supply possibly.

15        MS. BATSCH:  That is all of the questions I have for

16   Dr. Zahtz.  I would like to ask Mr. Abdullah a couple of

17   follow-up questions.  I don't want to get out of order though.

18        THE COURT:  So you do want to call Mr. Abdullah?

19        MS. BATSCH:  One quick question.  We can go ahead and

20   do it by affidavit.  That is fine.  I don't want to create a

21   bigger issue.

22        THE COURT:  Once you call Mr. Abdullah -- all right.

23        MS. BATSCH:  Let's do it by affidavit.

24        THE COURT:  All right.  Anybody else, any questions

25   for Dr. Zahtz?

27

1          MR. ADAMS:  No.

2          THE COURT:  Doctor, you're excused.  Thank you very

3     much.

4          DR. ZAHTZ:  Thank you.

5          THE COURT:  Miss Thielen, we have already sworn you

6     in.  Very good.  Let's inquire of Miss Thielen.

7        REBECCA THIELEN, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

8                       DIRECT EXAMINATION

9     Questions by Mr. Adams:

10    Q.    Miss Thielen, can you very briefly go over your job

11    title and what your job responsibilities are, please?

12    A.    My job title is state nursing supervisor.  I supervise

13    just the state nurses and our health care administrator, she

14    is on vacation or she would be here, and the DON, Director of

15    Nursing spot is vacant, therefore, I am here today.  They are

16    in charge, I guess, what do you want to say, for the health

17    care unit.

18    Q.    Thank you.  Are you able or have you been able to

19    review plaintiff's medical records to date?

20    A.    Somewhat.  For the recent record, yes, I have somewhat.

21    Q.    Based on your review of the records, could you tell us

22    the status of any eye glasses that have been ordered for

23    plaintiff?

24    A.    Yes.  He had photo gray eye glasses ordered at your

25    previous institution in 2016 because he arrived here June 14th

28

1   of 2017.  He is not due for a renewal or recheck or issued a

2   new frame and lenses, unless there are severe problems with

3   his vision or they break, until September of 2018, so this

4   year in September.

5   Q.    So based on the medical records, do medical records

6   reflect then that plaintiff does have the telebinocular

7   glasses that have been prescribed for him?

8   A.    The telebinocular glasses -- Dr. Ludford, our eye

9   doctor that is not here today, not here until Wednesday, but

10  according to his notes Mr. Abdullah said they weren't -- said

11  it wasn't working, so to the doctor's knowledge, they were

12  sent home, because if somebody has them in their property that

13  doesn't work or they don't need anymore, it goes back to

14  property and they have the chance of sending it home or

15  destroying it.  I don't know what Mr. Abdullah did with that.

16  Does that make sense what I am saying?

17  Q.    It does.  Thank you.  So does plaintiff have any eye

18  glasses right now at the moment, you know, according to your

19  notes?

20  A.    Yes, he does.  He is wearing glasses right now, but

21  they are not tinted, or do they tint when you go outside?

22  Okay, they are photo gray when you go outside.  Clear inside,

23  photo gray outside.

24       MR. ADAMS:  Okay, thank you.  I want to briefly talk

25  to the ADA coordinator right now, Your Honor, if I could.

29

```
 1              THE COURT:  Let's keep this witness.  Any questions
 2   for this witness Mr. Dugan?
 3              MR. DUGAN:  No, Your Honor.
 4              THE COURT:  Any cross examination of your witness?
 5              MS. BATSCH:  Yes, Your Honor.
 6                          CROSS EXAMINATION
 7   Questions by Ms. Batsch:
 8   Q.     Miss -- is it Thielen, your last name?
 9   A.     Thielen.
10   Q.     I am sorry, all of us having problems with --
11   A.     Thielen.  Like the country, but spelled different.
12   Q.     Just a couple of questions.  You mentioned you are a
13   state nursing supervisor, is that correct?
14   A.     Yes.
15   Q.     Are you employed by the IDOC?
16   A.     Yes, I am employed by the State of Illinois.
17   Q.     Okay.  Do you have any responsibilities as they pertain
18   to Dixon?  Have you ever visited Dixon before today?
19   A.     Oh, no, I work here at Dixon CC as a state nursing
20   supervisor.  Yes, I am sorry, I didn't mean to be confusing.
21   Q.     Okay.  And do you -- you mentioned that you are
22   familiar with or at least have taken a chance to review
23   Mr. Abdullah's medical records, the most recent ones, is that
24   correct?
25   A.     Yes.  Not all of it 100 percent, but whatever I
```

1    anticipated maybe would be in questions today.

2    Q.     Okay.  Did you review a copy of Dr. John Russell's, the

3    low vision specialist, recommendation that he issued on

4    October 5th of 2017?

5    A.     I believe I did, but what is the date again?  I am

6    sorry.

7    Q.     October 5th of 2017.  Take a minute to get there if you

8    need to.

9    A.     I got that page right here.

10   Q.     Okay, perfect.  Do you notice the first recommendation

11   that Dr. John Russell made for video magnifier for printed

12   material?  Do you see that?

13   A.     Yes.

14   Q.     Based upon your review of Mr. Abdullah's medical

15   records, has Mr. Abdullah been provided the video magnifier

16   that was recommended by Dr. John Russell?

17   A.     As far as what I have heard, because I am really not in

18   the loop because I am the nursing supervisor.  I think there

19   was a security issue with that.  I don't know.  Ask Max when

20   you talk to him, that there was security issue with that

21   because of the material it is made out of, camera.

22   Q.     So do you know or can you affirm or deny whether

23   Mr. Abdullah has been provided with the video magnifier to

24   date?

25   A.     To my knowledge, no, he has not.

1    Q.     Okay.  Do you see the second recommendation made by Dr.

2    John Russell for ten times binocular lenses for distance

3    viewing?

4    A.     Yes, I do.

5    Q.     To your knowledge, has Mr. Abdullah been provided with

6    binocular lenses that are magnified ten times for distance

7    viewing to date?

8    A.     According to Dr. Ludford, that is our optometrist here,

9    it states that on August 10th of 2017 that he, "he" would be

10   the plaintiff, he wants ten times magnifier and sunglasses.

11   The next line says, "He told me two weeks ago telebinocular

12   lenses didn't work and they may already be sent home.

13          MR. ABDULLAH:  Two different pair.

14   A.     Oh, is it?  All right, I didn't know.  I'm not an eye

15   doctor.  It was noted --

16          MR. ABDULLAH:  It was noted it was brought from

17   Pinckneyville.

18   Questions By Ms. Batsch:

19   Q.     Feel free to state I don't know if you don't know the

20   answer to this, but do you know if Mr. Abdullah, since the

21   August of 2017 recommendation by Dr. John Russell, if he has

22   been provided with the ten times binocular lenses for distance

23   viewing that were recommended by Dr. Russell?

24   A.     I do not know.

25   Q.     Okay.  Just moving along the order, do you see that Dr.

1    Russell recommended that Mr. Abdullah be provided with

2    permanently dark tinted lenses for glare?

3    A.    I have to get to that again.  That was August 5th you

4    said or October 5th?

5    Q.    October 5th.

6    A.    Okay, we'll get back to that part.  I don't know where

7    it went.  I can't find it.  It is in here somewhere.  I know

8    that he had recommended -- I don't know if it was permanent

9    dark to me or photo gray.

10   Q.    It might help if I can direct your attention to the

11   number on the bottom of the page.  My copy is marked -- I

12   don't know if your copy is marked the same -- my copy is

13   marked DOC 0254 at the bottom.

14   A.    I just have his medical chart with me.  We don't have

15   anything numbered like evidence or anything like that.

16         MR. DUGAN:  Counsel, it's a medical special services

17   referral and report.

18   A.    I found it.

19   Q.    Did you find it?  I am looking under the recommendation

20   piece of this.  Is it correct that Dr. Russell recommended

21   dark tinted lenses, and I am sorry, I am having -- maybe you

22   can interpret this better than I can.  It says full four image

23   I believe for glare?

24   A.    Yeah, it says dark tinted lenses full something for

25   glare.

1   Q.     Okay.

2   A.     I can't read his writing.

3   Q.     I know that you mentioned previously that Mr. Abdullah

4   had been given some kind of lenses, but the specific dark

5   tinted lenses that are referenced in this low vision

6   specialist recommendation, do you have any knowledge whether

7   those lenses have been provided to Mr. Abdullah to date?

8   A.     The only glasses that have been given to him that would

9   meet the criteria that I know of, IDOC, is the photo gray

10  where they turn dark when you go outside in the sun, but they

11  are clear.  That is what he was issued was the photo gray

12  glasses.

13  Q.     So those are not full tinted lenses, is that correct?

14  A.     They are not blackout glasses, no.

15  Q.     Moving along past the walking cane, the last

16  recommendation that Dr. Russell made is a talking watch or

17  clock.  Do you see that?

18  A.     Yes.

19  Q.     Okay.  To date, do you know if Mr. Abdullah has been

20  provided with a talking watch or clock?

21         MR. ADAMS:  Before you answer, Miss Thielen, I would

22  enter an objection.  A talking watch or clock is not part of

23  the claims in this case, so I don't know what sight related

24  service or program that relates to, but we could talk about a

25  whole bunch of medical issues that are not front of the Court

34

1    today, but I prefer if we not go down that route.

2              MS. BATSCH:  In terms of the plaintiff's response --

3              THE COURT:  Ma'am, thank you.  Overruled.  Go ahead.

4    You can answer.

5    Questions By Ms. Batsch:

6    Q.    You may answer.

7    A.    Oh, I do not know.  That would be an answer that the

8    ADA coordinator could give, because he is the one that is

9    involved with the ADA appliances that would be needed or not

10   needed.  That would be Max Blackburn.

11             MS. BATSCH:  Thank you, ma'am.  That is all of the

12   questions I have for Miss Thielen.

13   Questions By The Court:

14   Q.    The Court has a question for you.  You testified

15   earlier that according to your records, Mr. Abdullah would not

16   be eligible for glasses again absent breaking them or

17   something until September of this year, correct?  Do you

18   recall that?

19   A.    Right.  The ADs and IDs state for anybody that has

20   glasses issued to them for prescription reasons, they get seen

21   every two years and are eligible for new glasses every two

22   years.

23   Q.    Here is my question.  Does that policy still -- is that

24   policy still in effect?  It appears that there was an

25   intervening prescription, so if there is an intervening

1    prescription, does that two year policy still -- is that still

2    in effect?

3    A.    No.  If there is something that happens like trauma to

4    the eye that all of a sudden their vision gets lower or some

5    kind of issue that happened with their vision, of course,

6    we're going to see them and, of course, we have to get

7    different glasses for them.

8    Q.    I am a little confused.  Maybe the lawyers can help me

9    out with this.  I thought that there was a new prescription.

10   I thought the evidence was there was a new prescription for

11   these telescopic lenses in October of 2017.  Isn't that what I

12   heard?

13         MR. ABDULLAH:  It is two different things.

14   A.    They are two different appliances.  Does that make

15   sense?  And even like a new pair of glasses and has the

16   telescopic, it is glasses and you have a separate set of

17   telescopic.

18         MR. ABDULLAH:  The glasses ordered were full time

19   permanently tinted that was ordered --

20         THE COURT:  I understand.  I understand.

21         MS. BATSCH:  So Mr. Abdullah, just in terms of

22   instructions, like I said, we're going to submit your

23   testimony via affidavit.  I know you are just trying to

24   clarify the issues so we appreciate that, but, you know, know

25   that you will be given a full opportunity to present

1    additional evidence.

2          MS. BATSCH:  Just one follow-up question based upon

3    the Judge's question.

4    Questions By Ms. Batsch:

5    Q.    So you testified previously in response to the IDOC

6    questions that Mr. Abdullah or any inmate for that matter

7    would not be given new eye glasses, you know, except for every

8    two years.  That was a terrible question.  Let me rephrase.

9    You testified earlier that absent some kind of intervening

10   prescription, Mr. Abdullah's eye glass prescription would not

11   be renewed earlier than two years?

12   A.    Right, unless there is some kind of underlying medical

13   problem or vision issue.  It is just like, for example, if

14   somebody has a type of hypertension, they get seen every six

15   months no matter what.  If somebody says I don't feel good, I

16   got a headache and it is one week after clinic, of course we

17   see them and treat them.  Does that make sense?

18   Q.    Sure.  The fact that he was provided with eye glasses,

19   some form of eye glasses in 2016, doesn't have any bearing on

20   whether Dixon provides the additional recommendations that

21   were issued by Dr. Russell in August of 2017, or I am sorry,

22   October of 2017, does it?

23   A.    Well, outside the hospitals make recommendations and

24   then the medical director here decides I guess the

25   recommendations that go along with collegial, which is behind

1  the scenes and I don't --

2  Q.    I understand you are not part of that practice.  My

3  question is, just would the fact that Mr. Abdullah received

4  eye glasses in 2016 basically cancel out the recommendations

5  of Dr. Russell in 2017?

6  A.    Not necessarily, because that would have to go under

7  presented at collegial.  Just as doctors recommend certain

8  kind of medications at the hospital, they may say oh, well,

9  we've got another medication that will work, because there are

10  all kind of anticoagulants.  There may be other equipment out

11  there that worked just as well.  I don't know that.  I am not

12  an ophthalmologist or eye doctor.  To be honest with you, I

13  can't read everything about what the eye doctor writes, so I

14  can't interpret what he writes.  I can't interpret

15  prescriptions, but Dr. Ludford, he is here on Wednesday if you

16  needed to get the information from him.

17  Q.    So you would defer --

18      MR. ADAMS:  Your Honor -- I am sorry, I'll just

19  follow up.  I would like to have follow up after questions.

20  Questions By Ms. Batsch:

21  Q.    So you would defer to the -- is it fair to say that you

22  would defer to the recommendation of the ophthalmologist, Dr.

23  John Russell, as you do not have any qualifications to

24  determine what Mr. Abdullah requires to see?

25  A.    I do not know.  I do not pretend to know that I

38

1   understand anything about ophthalmology.  I am just telling

2   you.

3            MR. ADAMS:  I am going to object to the scope of this

4   questioning.  This witness is here to review and provide

5   opinions based on the review of the medical records.  She is

6   not an ophthalmologist nor an expert on institutional --

7            THE COURT:  Speaking of objections, make legal

8   objections.  Your objection is on the basis of relevance,

9   correct?

10           MR. ADAMS:  Yes, Your Honor.

11           THE COURT:  All right.  On that basis the objection

12  is sustained.

13           MS. BATSCH:  I don't have any other questions, Your

14  Honor.

15           THE COURT:  All right.  Anything else you wanted to

16  follow up on, go ahead.

17                      REDIRECT EXAMINATION

18  Questions by Mr. Adams:

19  Q.     Nurse Thielen, just as review, you are not the medical

20  expert or treating physician in this situation, are you?

21  A.     No.

22  Q.     Miss Thielen, do you have any kind of training or

23  experience in ophthalmology?

24  A.     No.

25  Q.     Would you be the individual to talk to or an IDOC

39

1   representative in terms of what is permissible via

2   administrative directive or institutional directive?  Would

3   you be the person well versed in those guidelines?

4   A.      Pertaining to?

5   Q.      Institutional and administrative directives relating to

6   eye care for patients.

7   A.      No, I would be -- I have limited knowledge, put it that

8   way.

9   Q.      Is it your understanding that the purpose of your

10  testimony today is to provide review of the medical notes in

11  plaintiff's medical history?  Is that why you were brought in

12  to talk today?

13  A.      Yes.

14          MR. ADAMS:   Thank you.

15          MS. BATSCH:  Plaintiff would make an objection as to

16  this witness' entire testimony as she has admitted she is not

17  qualified to opine on what plaintiff needs as far as eyesight

18  goes, and she has also admitted that the fact that plaintiff

19  received eye glasses in 2016 has no bearing as to what he

20  needs in 2017.

21          THE COURT:   Overruled.

22  Questions By The Court:

23  Q.      I got a question for you.  I'm afraid to ask to open

24  the door, but I have one more question for you.  I want to

25  make sure I understand your testimony.  Your testimony is, and

1    this was on all outside folks, not just ophthalmology ones,

2    but there is a recommendation from somebody outside, it comes

3    to the medical director at the prison, correct?

4    A.    Yes.

5    Q.    The medical director will then take his recommendation,

6    will make a recommendation, which will then go to collegial,

7    correct?

8    A.    Yes.

9    Q.    And collegial will decide, along with the medical

10   director, whether to follow the outside recommendation,

11   correct?

12   A.    Yes.

13          THE COURT:  Okay, very good.

14          MS. BATSCH:  I am sorry, I do have one more question.

15          THE COURT:  I want to know what it is.

16          MS. BATSCH:  My only follow-up question is whether

17   Miss Thielen has any knowledge as to time lines or deadlines

18   for those review procedures.

19          THE COURT:  That is fair.  Let me ask her.

20   Questions By The Court:

21   Q.    Do you have any knowledge of how long this process

22   takes from an outside recommendation?

23   A.    You mean from the time the medical director, from the

24   time the appointment happens to the review?

25   Q.    No, from the recommendation from the outside person to

41

1   the medical director to the review.  How long does that

2   normally take, if you know?

3   A.      I honestly don't know.

4   Q.      Okay.

5   A.      Because I don't -- it is the Director of Nursing that

6   sits in on the collegial process and I am the nursing

7   supervisor and, unfortunately, our Director of Nursing

8   position is vacant right now.

9           THE COURT:  All right.  If you don't know, that is

10  fine.  Anything further for this witness?  All right, very

11  good.  Thank you, ma'am.  Can we excuse her?  Witness is

12  excused.  Thank you, ma'am.  Now your other witness is whom?

13          MR. ADAMS:  The ADA coordinator at the facility.  His

14  name is Max Blackburn.  Mr. Blackburn, are you there?

15          THE COURT:  Hold on one second.  Mr. Blackburn?  All

16  right, very good.  If you raise your right hand, I'll get you

17  sworn in or affirm as Dr. Zahtz reminded me.

18          MAXWELL BLACKBURN, DEFENDANT'S WITNESS, SWORN

19                  DIRECT EXAMINATION

20  Questions by Mr. Adams:

21  Q.      Mr. Blackburn, very briefly, could you just explain

22  your role and position at Dixon Correctional Center?

23  A.      Presently appointed as the facility ADA coordinator for

24  the facility.

25  Q.      In terms of being the ADA coordinator of the facility,

42

1   what are some of your roles and duties?  What would you have

2   knowledge of?

3   A.     Basically any time we have an offender who is deaf,

4   blind or physically handicapped, I have to make sure we're

5   sticking to our policy of providing them access to facility

6   programs and that they are able to participate in them like

7   any other offender would do.

8   Q.     To your personal knowledge with plaintiff, does he have

9   any handicap that you are aware of, and if so, what would that

10  be?

11  A.     I'm not at liberty to review the medical file like any

12  of the other staff here.  It has been reported to me by the

13  offender he has vision limitations.  I have sought and

14  received some information from the medical all the way back in

15  July of 2017.  I understand that he does have limitations, but

16  the recommendations that I got from the ophthalmologist at the

17  time when I was reviewing the request of the talking watch was

18  that it was not needed at that time, however, it was noted

19  that the low vision specialist would be forthcoming.  Since

20  that time I have not received any instructions to provide any

21  other items.

22  Q.     In terms of video magnifier, would there be any

23  problems in terms of the safety and security of the facility

24  with a video magnifier, and if you could explain what that is,

25  I am sure the Court would appreciate it.

43

1      THE COURT:  Hold on.  You told me earlier the

2  evidence was that the video magnifier -- the evidence before

3  me was it was a security issue.  Are you going to have the ADA

4  coordinator testify about security?  Is that what you are

5  doing?

6      MR. ADAMS:  Yes, Your Honor, it would be that the --

7      THE COURT:  Then you need to lay a foundation that he

8  has some knowledge in this area, because I am not familiar

9  with the ADA coordinator being a security person.  Go ahead.

10 Questions By Mr. Adams:

11 Q.   Mr. Blackburn, besides being the ADA coordinator at the

12 facility, what are some of the additional duties -- have you

13 ever held a correctional role?

14 A.   My primary duty in my administrative assistant one

15 title is to review and uphold all administrative and

16 institutional directives for the agency and the facility

17 making sure, again, we're in compliance with those.  Those

18 include security programs, basically everything in a

19 theoretical on paper sort of capacity.  So again, making sure

20 that we're in compliance with all of our written directives.

21 Q.   So you are familiar with institutional administrative

22 directives in terms of security at the facility, is that

23 correct?

24 A.   Yes.

25 Q.   You are able to testify about those specifications and

1    requirements today, is that correct?

2    A.    Yes.

3            MR. ADAMS:  Your Honor, is it okay with if we proceed

4    with safety and security?

5            THE COURT:  Yes.

6    Questions By Mr. Adams:

7    Q.    Thank you.  Mr. Blackburn, in terms of your experience

8    dealing with safety and security issues and requests for

9    medical devices or accommodations, what is a video magnifier

10   and are there any problems with that in terms of safety and

11   security at the facility?

12   A.    From what I understand, the video magnifier was to be

13   based on an earlier request in 2017 from another offender when

14   I was asked to research it by assistant warden of operations.

15   This is an electronic device that operates with a battery,

16   uses a charger and it utilizes a camera and LED screen to

17   record and project on the screen anything it read over.  For

18   this other offender we reviewed this at length and determined

19   it was not appropriate for our facility based on its use of

20   camera, which we do not allow under any other circumstances,

21   and its also a bit of an issue with the charger.  Not

22   specifically for that charger, but chargers are a big deal in

23   corrections because they may be able to charge cell phones or

24   other significantly more problematic devices for that other

25   offender we denied.  For this particular case, I was not asked

45

1    to look into it as I understand it to be something prescribed.

2    That is outside my realm.  I do not deal with medical

3    prescriptions.  I was able to apply the knowledge that we

4    gained from 2017.  As far as other variables that would change

5    our current feel of the device, we would still deny it based

6    on all of the same reasons we did in 2017.

7    Q.    Thank you, Mr. Blackburn.  Sir, just a quick recap of

8    your testimony.  Because the video magnifier has both camera

9    and chargers, that those are two big issues for safety and

10   security at the facility, is that correct?

11   A.    Correct.

12   Q.    To your personal knowledge or experience, are there any

13   inmates at Dixon right now that have access to a video

14   magnifier?

15   A.    There are none.

16   Q.    I want to move on to the recommendations for a talking

17   watch.  Are there any safety and security concerns with a

18   talking watch?

19   A.    Not for an offender who would benefit from it.

20   Q.    Are there other inmates at the facility that have

21   access to or are currently using a talking watch?

22        MS. BATSCH:  I am going to object on --

23   A.    Yes.

24        MS. BATSCH:  -- the basis of relevance.  What other

25   people are receiving doesn't have any bearing on what

46

1   Mr. Abdullah has been prescribed and needs.

2          THE COURT:  I understand.  That objection is -- the

3   question was answered at this point.  Objection overruled.

4   Questions By Mr. Adams:

5   Q.    Just to follow-up, still there are inmates with talking

6   watches at the facility, is that correct?

7   A.    Yes.

8          MR. ADAMS:  Those are my only questions.  Thank you.

9          THE COURT:  All right.  Cross examination?

10         MS. BATSCH:  Sure.

11         THE COURT:  I am sorry.  Mr. Dugan, anything for this

12  witness?

13         MR. DUGAN:  No, Your Honor.

14         THE COURT:  Cross examination?

15                     CROSS EXAMINATION

16  Questions by Ms. Batsch:

17  Q.    Sir, you mentioned that you had evaluated another

18  inmate who had requested a video magnifier in preparation for

19  your testimony today, is that correct?

20  A.    That situation happened in 2017.  I found that

21  information to be relevant to this case, which is why I am

22  presenting it.

23  Q.    Okay.  With regard to that particular inmate, was

24  there, and I believe you answered no, but was there any type

25  of medical prescription or other medical evidence to support

1  that that inmate needed a video magnifier?

2  A.    I was not allowed to review the medical documentation,

3  HIPPA regulations and everything.  The reason I got involved

4  with that initially was that offender had reported that he

5  used one on the outside and needed one inside as well.

6  Q.    So is it your testimony today that when evaluating

7  requests for a medical accommodation, you are not allowed to

8  review the medical files in support of that accommodation?

9  A.    I receive a recommendation from the medical, from our

10  medical staff.  I meet with the offender and then we determine

11  the need based on both of those things.  Again, keep in mind

12  ADA items are entirely outside of prescription items.  Talking

13  watch is really the only item I can deal with here.

14  Everything else is prescription based, has to be handled by

15  health care, not me.

16  Q.    With regard to Mr. Abdullah's request for video

17  magnifier, if that request had been precipitated by an actual

18  medical prescription or medical recommendation, what would be

19  your authority or what would be the interplay between what you

20  do and that medical prescription?  I mean would you be privy

21  to that medical prescription when deciding whether or not that

22  video magnifier would be a reasonable accommodation under the

23  ADA?

24  A.    The process by which I would understand it, it would be

25  prescribed to the offender, go through Wexford's collegial

48

1   system, our central supply would order the item and then it

2   would come to our assistant warden of operations to decide

3   whether or not it was appropriate for the facility.  In that

4   case I would not be related.  However, again, I have in the

5   past reviewed the same type of item.  That was the information

6   I provided to the assistant warden of operations.  He denied

7   it at the time.  Again, another situation for another

8   offender, but the same device.

9   Q.     So I want to be crystal clear here.  With regard to the

10  recommendation received by Mr. Abdullah from his low vision

11  specialist, you have not reviewed that recommendation and are

12  not privy to that information,is that correct?

13  A.     That information was shared with me by the offender.

14  He advised me of it, but I have had to recommend it back to

15  health care.  I know they are aware of it.  I have not

16  actually seen the order from the low vision specialist.

17  Again, because it was part of his medical file and I am

18  outside of the health care department, I would not see it

19  directly.

20  Q.     Okay.  So as an ADA coordinator, you mentioned a couple

21  of responsibilities that you had, including reviewing physical

22  handicaps in determining what an inmate might need to address

23  those handicaps.  Do you also determine what is and is not a

24  reasonable accomodation under the ADA for inmates?

25  A.     It depends on the situation.  If it is something we

49

1   already allowed in the past and the offender meets the same

2   criteria, it could be approved directly by me.  On the other

3   circumstances, if it is something we never provided or a

4   unique situation, it would go to the agency ADA coordinator in

5   Springfield.

6   Q.    Okay.  So given the fact that video magnifier was not

7   previously approved, as I believe you mentioned earlier, you

8   would not have that recommendation as to whether Mr. Abdullah

9   would receive a video magnifier.  It wouldn't be handled by

10   you, it would be handled by Springfield, is that right?

11   A.    It may be in part.  I do recall we had our ADA request

12   denied for it then, but that was a previous offender.  It

13   could go there.  Again, I was not asked in this situation for

14   this offender to provide that information.  The reason I

15   presented it here today is because I am aware of what will

16   happen once we get to that point.

17   Q.    As far as security goes, if something is determined to

18   be a security risk, are you instructed or is it the policy and

19   procedure of Dixon or the IDOC to automatically deny that

20   request?

21       MR. ADAMS:  Objection to scope, relevance and the

22   witness' personal knowledge.

23       MS. BATSCH:  He testified earlier that he is directly

24   responsible for deciding whether or not things are reasonable

25   in light of security concerns.  I would say that --

1          THE COURT:  For Dixon, correct?

2          MS. BATSCH:  For Dixon, correct, so I'll limit it to

3    Dixon first.  I'll restate the question.

4          THE COURT:  Overruled.  Go ahead.

5    Questions By Ms. Batsch:

6    Q.      As to the particular facility that you are at, Dixon,

7    is there -- are you aware of a policy or procedure that

8    requires you to deny a request for an accommodation if it is

9    considered to present a security risk?

10   A.      Let me clarify again.  A decision on an item like that

11   for screening purposes is done by assistant warden of

12   operations, but I do provide information for the

13   recommendation just to educate them on the device and so

14   forth.  Ordinarily we don't really have to make these

15   decisions.  These are items we allow or don't allow.  As far

16   as new items, again, I would provide information to the

17   assistant warden of operations, but it would be his decision

18   to deny or approve.

19   Q.      Okay.  So other than providing information to someone

20   else, you do not make the ultimate decision as to whether an

21   accommodation is reasonable or not, is that correct?

22   A.      Only if it is an existing accommodation that we make

23   for other offenders that is provided and referenced in our AD

24   on the subject.  In this particular case -- most of these

25   items pertain to other detached disabilities, particularly

1   those that would help deaf offenders, for example.  There are

2   multiple items listed in the administrative directive that I

3   can provide.  I do not need special permission for that other

4   than to complete a DOC 401.  That does not apply to this

5   situation, but that is an example.  Certain items like that

6   listed in the AD are allowed for me to provide based on my own

7   decision and recommendations from health care.

8   Q.     All right, fair enough.  As far as the talking watch is

9   concerned, you mentioned that there are no safety concerns as

10  to apply to that talking watch.  Is that fair to say?

11  A.     As long as the offender will benefit from it.  We're

12  not going to issue it to someone who does not need it simply

13  because it could be traded, trafficked, anything like that.

14  Again, we have to have some sort of medical clearance from our

15  health care unit to be able to provide that.

16  Q.     Okay.  So if there was a medical recommendation that

17  was approved by your medical director, Dr. Zahtz, would that

18  override any safety concerns that you may have as to that

19  talking watch?

20  A.     If I received that, yes, I would be able to issue.

21  However, the reason I have not to date is because the original

22  recommendation I got from our optometrist stated it was not

23  necessary, and at the present I have only received that or the

24  offender has advised me that Dr. Zahtz has provided other

25  information.  Again, I do not review the medical file.  I have

52

1    requested more information from health care.  I have not

2    received any direction to proceed or not proceed since I made

3    my last recommendation, since I made my last request for

4    information.

5    Q.    You mentioned that another optometrist found that a

6    talking watch was not necessary.  What was --

7    A.    No, the other facility optometrist.

8    Q.    What was the date of the optometrist's opinion?

9    A.    The only date I have available is the date I logged his

10   response, which was August 18th of 2017.

11         THE COURT:  I'm sorry, August of?

12   A.    August 18th of 2017.

13         THE COURT:  Okay, very good.

14   Q.    If an order came in from an optometrist dated two

15   months later, dated October of 2017, approving and

16   recommending a talking watch, you would defer to the later

17   recommendation?

18   A.    If that recommendation came from our facility

19   optometrist, yes.  Right now I have not received any new

20   instructions from him.  I just have a report of a conflicting

21   order.  I requested more information on what to do.  I have

22   not received any new information.  This is the first time I

23   have gotten a conflicting order like this.

24   Q.    Sure.  You mentioned before that you had not seen Dr.

25   Russell's recommendations yet for Mr. Abdullah, is that

1    correct?

2    A.    I have not seen the actual document, no.

3    Q.    Okay.  Now, you know, I know you haven't seen them, but

4    I will represent to you that Dr. Russell's recommendations

5    were made at the beginning of October of 2017.  Is it normal

6    or within standard practice that more than four months would

7    pass between a prescription for something to treat someone's

8    vision or deafness or what not and that prescription reaching

9    you?

10   A.    I can't answer that.  I don't handle prescription

11   items.

12   Q.    Okay.  So can you clarify for us what the procedure is

13   from the time that something is prescribed to the time that it

14   is either granted or denied?  You know, what are all of the

15   layers that has to go through before final determination is

16   made as to whether that is going to be provided to the inmate

17   or not?

18         MR. ADAMS:  Objection, asked and answered.  This is

19   going out of the scope of the witness' personal area of

20   expertise.  He just testified that he has nothing to do with

21   the issuance or guidelines of prescriptions.

22         MS. BATSCH:  Your Honor, the fact that he has nothing

23   to do with making that final determination has nothing to do

24   with whether he knows what the steps are in getting to that

25   final determination.  I would ask that the witness let us know

54

1   if he is privy to that information and then we can know if he

2   has the knowledge or not.

3          THE COURT:   I kind of heard him say already that he

4   doesn't know, but to the extent he can answer that, you can

5   reask the question succinctly.   I'll allow him to answer.   I

6   think the evidence is he said he didn't know, but go ahead.

7   Questions By Ms. Batsch:

8   Q.    Just to clarify, I am just asking if you are aware of

9   the procedure that is followed from the time that a

10  prescription is made until that time when the final

11  determination is made as to whether the recommendation in that

12  prescription is denied or granted.

13  A.    In this case I am going to say no.   I mean in general I

14  am not going to know that.   This is a situation that is

15  particularly unique in that it is being recommended by someone

16  outside of our facility, a non state medical person.   Overall,

17  no, that has to be handled by health care.   I am sorry I can't

18  answer any further.

19  Q.    Okay, so you have no knowledge as to what policies or

20  procedures would be followed if there is a conflicting report

21  between your resident ophthalmologist or your resident

22  specialist or someone outside of the facility?

23         THE COURT:   Asked and answered, counsel.   He answered

24  that.   Move on.

25         MS. BATSCH:   I don't have any other questions.

55

1        THE COURT:  All right.  Anything further for this

2  witness?

3        MR. ADAMS:  No, Your Honor.

4        THE COURT:  All right, thank you.  You are excused.

5        I want to talk very briefly about what is still in

6  front of the Court.  Unless the parties wish to make argument,

7  the Court has heard the evidence, but there are things that we

8  need to take up.

9        First of all, I have heard that there is going to be

10  today from Dr. Zahtz a collegial on the rheumatologist for

11  Mr. Abdullah.  I would ask that a notice as to the status of

12  that be given to the Court by Friday, which is March the 2nd.

13        Okay, now understanding that the issue of following

14  any recommendation is still out there.  I don't know how you

15  deal with that other than -- I really don't, but I do

16  recognize that you say that issue is still out there.

17        He is still there.  I had a question for you.  I did

18  have a couple of questions, I am sorry.  I wrote them down and

19  then I forgot.

20  Questions By The Court:

21  Q.   Let me ask -- this is Mr. Blackburn.  Can you hear me

22  Mr. Blackburn?

23  A.   Yes.

24  Q.   I had a couple of questions for you.  This video

25  magnifier, was there any consideration given to having one

1   available for the facility, say, in the library?  Was that

2   considered at all?

3   A.      No, it was not.

4   Q.      Okay.  Let me ask you the other question.  You also

5   talked about a couple of things being problems in the

6   institution.  One was cameras and the other was chargers.  Are

7   there regulations against inmates having cameras?  You talked

8   about regulations.  Are those in the --

9   A.      Yes, sir, cameras will be disallowed throughout any

10  institution in IDOC.

11  Q.      Okay, but I am specifically asking, is that contained

12  in the regulations?

13  A.      I believe so.  I would have to reference them, but I

14  believe it is specifically listed.

15  Q.      Okay.  What about chargers?  Is it your information

16  that is also specifically listed?

17  A.      Yes.

18  Q.      All right.  Those were the questions I had for you.

19          THE COURT:  Now let's go back to -- we'll get the

20  notice on the rheumatologist by Friday.  We also had some

21  other issues to take up.

22          MR. ADAMS:  I apologize, Your Honor.  May we dismiss

23  Mr. Blackburn?

24          THE COURT:  Absolutely.  We don't have anything

25  further for Mr. Blackburn, right?

57

1        MS. BATSCH:  No.

2        THE COURT:  You are excused.  Thank you.

3        We also talked about in the order setting this

4    hearing, I said that I wanted you guys to be prepared to

5    discuss the deadlines and the potential for expert discovery.

6    I don't know where we are on the deadlines.  Do we have a

7    schedule?  They were vacated, okay, so we don't have any

8    deadlines in this case.  What do we think -- we believe and we

9    need to talk about the case as if it will exist after the

10   issue of Pavey has been decided.  How much time -- well, first

11   of all, I heard you speak about experts already so you

12   anticipate having experts, correct?

13       MS. BATSCH:  Correct.

14       THE COURT:  Okay.  Why don't you guys do this.  Why

15   don't you all talk and send me a proposed schedule, okay?

16       MS. BATSCH:  Your Honor, I do have one question for

17   the Court.  You know, there is a first amended complaint out

18   there.  I don't know whether the defendants intend to file

19   similar motions for failure to exhaust.  I am assuming they

20   probably will, but if --

21       THE COURT:  At least one new defendant.

22       MR. DUGAN:  Wexford.

23       MS. BATSCH:  I don't want to run into the same

24   problem we had where we have to vacate the deadlines because

25   that issue is being decided.

58

1          THE COURT:  Hold on.  Have you looked at Wexford as a

2     new defendant?

3          MR. DUGAN:  With respect to exhaustion I have not,

4     sir.

5          THE COURT:  Okay, you haven't.  Okay, Wexford has not

6     been served.  Do you want the Court to assist in service?

7          MS. BATSCH:  Yes, Your Honor.

8          THE COURT:  All right, so now we know that.  I would

9     assume, and I am making assumptions and you always get in

10    trouble, but you spoke about a new complaint.  To the extent

11    that it involves Dixon, I would assume that there may be an

12    issue as to exhaustion brought up, is that correct?

13         MR. DUGAN:  With respect to any new defendants we

14    would like an opportunity to look at it.

15         MS. BATSCH:  The plaintiff, Your Honor, would like

16    the opportunity as well given we just received the medical

17    records to be allowed to assert additional allegations that

18    pertain to Dixon if, in fact, there are.

19         THE COURT:  Here is the deal as far as -- you can

20    make the motion, but understand, and I don't have any idea

21    what the allegations would be or what the posture would be,

22    but exhaustion is a big deal and I think you need to look at

23    any claims that you bring to see if they fit under the law of

24    exhaustion or the things that would excuse exhaustion.

25         MS. BATSCH:  Your Honor, we would narrowly tailor any

59

1    amended allegations or additional allegations to be confined

2    to those grievances that have been deemed exhausted already.

3    We're not planning on asserting new allegations for the first

4    time.

5           THE COURT:  All right, well, why don't we do this?

6    Why don't you all talk and give me a proposed schedule.

7           (Whereupon a discussion was held off the record.  The

8    following proceedings were held in open Court.)

9           THE COURT:  So right now we're dealing with January

10   of '19 trial date.  Why don't we work from that trial date.

11   That is ten months.  Let's try to keep that trial date, but

12   you all send me -- you all talk and send me a proposed

13   schedule by next -- today is the 26th.  Can you send it to me

14   by next Monday, the 5th?  You all get together and send me a

15   proposed schedule by March 5th.

16          MR. DUGAN:  Aren't you going to be long gone by

17   January, sir?

18          THE COURT:  No, I'll be here.  I'll be close.  I'll

19   be close.  The wind will with be blowing on my shirt tails at

20   that point, but I'll still be here.

21          Okay, now let's talk about the affidavits and when I

22   want those.  Can we have those affidavits, let's see, one

23   week, two weeks, three weeks, can we have those by the 19th?

24   That is three weeks.

25          MS. BATSCH:  I can do my best, Your Honor, but

60

1    honestly I would request a month if we could because we have

2    to -- the experts have to review all of the medical records

3    submitted Friday.

4         THE COURT:  All right, March 26th.  Now tell me how

5    you want to handle your affidavits.

6         MR. DUGAN:  Based on what happened today, Your Honor,

7    I think my only affidavit would be in response to theirs.

8         THE COURT:  That is what I am asking.  How much time

9    do you want?

10        MR. DUGAN:  Two weeks.

11        THE COURT:  Okay, so plaintiff's by March 26th,

12   response by defendant -- and IDOC doesn't intend to submit

13   any, correct?

14        MR. ADAMS:  That's correct, Your Honor.

15        THE COURT:  So defendant, any response -- well, at

16   this point they are not in the case, correct?  All right, tell

17   you what we're going to do.  I am not certain that there is

18   anything, given the procedural posture of this case, the fact

19   that Wexford has not been served, the fact that Wexford does

20   want to be heard on this issue, I think what we're going to

21   do, because I don't even know if there is any of the old

22   motion left, okay, so I think what I am going to do is vacate

23   the old motion for preliminary injunction, let you file a new

24   motion, okay, understanding that we have already heard the

25   evidence on it, and then in that order allow the supplemental

 1    affidavits, okay, even given the fact that we will just call

 2    Wexford at this point an interested party, not a defendant,

 3    but interested party.  IDOC will not have a response, but

 4    their evidence from the hearing will be taken up, okay, as to

 5    the new motion.

 6         MR. ADAMS:  Would IDOC be able to respond to, I

 7    guess, any new allegations in the affidavit in terms of

 8    medical care?  That is the only thing I would be concerned

 9    about.

10         THE COURT:  Yeah, I don't know why not.  You have the

11    same two weeks.  Defendants and interested party will have two

12    weeks to respond, okay?  Does that -- is everybody

13    understanding what I am doing procedurally here, because, I

14    mean, Wexford is not in the case at this point and I just

15    think to have them -- even if we ordered something, they are

16    just not -- I don't know what it would mean.  It might be a

17    nullity, okay?

18         MS. BATSCH:  We understand.

19         THE COURT:  Why don't you get that motion -- it

20    doesn't have to be -- we can incorporate the previous

21    allegations from, you know, you don't have to go and write --

22    you can reincorporate.

23         MS. BATSCH:  We'll make it as concise as possible.

24         THE COURT:  You can reincorporate a little from the

25    other document.  That is fine.  I don't have any issue with

62

1    that; as you can do with your response also.

2           MR. DUGAN:  Yes, sir.

3           THE COURT:  All right.  So we're going to get that by

4    March 26th from plaintiff, affidavits, April 9th.  Did we talk

5    about when you are going to file that motion?

6           MS. BATSCH:  Is that both motion and the affidavit on

7    March 26th?

8           THE COURT:  That's fine.  Any response -- I mean you

9    can incorporate the response you already did in any additional

10   affidavits by April 9th.

11          MR. DUGAN:  Fair enough.

12          THE COURT:  There we go.  I think that is it unless I

13   have forgotten something.  You are going to send me proposed

14   schedule.  Did we talk about when that was --

15          MR. DUGAN:  3-5.

16          THE COURT:  Okay, in a week you'll send me proposed

17   schedule.  Thank you very much.  Mr. Abdullah, thank you.

18          MR. ABDULLAH:  All right, thank you.

19          THE COURT:  Court will be in recess.

20          MS. BATSCH:  You can go ahead and leave,

21   Mr. Abdullah.  I know last time you didn't know when you could

22   leave or not.

23      (Court is adjourned.)

24          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
25
     SS/Barbara Kniepmann                        March 21, 2018

1                                  I N D E X

WITNESSES

2                                                    PAGE  LINE
DR. MERRELL ZAHTZ
3         DIRECT EXAMINATION                          22    9
          CROSS EXAMINATION                           25    1
4


5  REBECCA THIELEN
          DIRECT EXAMINATION                          27    8
6         CROSS EXAMINATION                           29    6
          REDIRECT EXAMINATION                        38    17
7  MAXWELL BLACKBURN
          DIRECT EXAMINATION                          41    19
8         CROSS EXAMINATION                           46    15

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25