IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SALIK ABDULLAH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:16-CV-920-NJR-MAB |
| | ) |
| WEXFORD HEALTH SOURCES, INC., | ) |
| DR. VIPEN SHAH, JACQUELINE | ) |
| LASHBROOK, and ILLINOIS | ) |
| DEPARTMENT OF CORRECTIONS, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter is before the Court on Plaintiff Salik Abdullah's Second Amended Motion for Preliminary Injunction (Doc. 144). For the reasons set forth below, the motion is granted in part and denied in part.

## PROCEDURAL HISTORY

Plaintiff Salik Abdullah is a 61-year-old inmate of the Illinois Department of Corrections (IDOC) who is currently housed at Dixon Correctional Center. Abdullah suffers from multiple medical conditions, including rheumatoid arthritis, anterior uveitis, ankylosing spondylitis, chronic hypertension, and high cholesterol (Doc. 110). He also is legally blind (*Id.*).

On August 16, 2016, Abdullah filed this action pursuant to 42 U.S.C. § 1983 alleging Defendants violated his constitutional rights by failing to provide him with adequate medical treatment and necessary accommodations for his disabilities (Docs. 1, 110). Abdullah is now proceeding on his First Amended Complaint (Doc. 110), in which

he raises four claims:[1]

> **Count 1:** Eighth Amendment deliberate indifference against Dr. Shah for failure to treat his serious medical conditions including hypertension, rheumatoid arthritis, ankylosing spondylitis, and anterior uveitis.
>
> **Count 3:** Eighth Amendment deliberate indifference against IDOC and Wexford for Wexford's policy or practice of keeping costs low instead of providing appropriate medical treatment as part of its contract with the IDOC and the IDOC's failure to ensure that Wexford provided adequate medical care.
>
> **Count 4:** Right of access retaliation claim against Lashbrook and the IDOC for retaliating against Abdullah for filing grievances by housing him in 5 house segregation cells with violent and dangerous cellmates, by changing his parole date from 2018 to the year 2492, and by taking his prescribed special eyeglasses from him.
>
> **Count 5:** ADA and Rehabilitation Act claims for refusing to house Abdullah in an ADA cell and denying him access to the ADA gym.

On November 4, 2016, Abdullah filed a *pro se* Motion for Preliminary Injunction (Doc. 18), which was later found moot when appointed counsel moved for leave to file an amended motion. On June 5, 2017, Abdullah filed an Amended Motion for Preliminary Injunction (Doc. 85), but a month later requested that the hearing on his motion be continued as he had been transferred to Dixon Correctional Center (Doc. 97).

On February 23, 2018, Abdullah filed an updated memorandum in support of his Amended Motion for Preliminary Injunction (Doc. 115). Magistrate Judge Wilkerson held a hearing on the motion on February 26, 2018, during which Abdullah indicated he intended to file another amended motion (Doc. 118).

The instant Second Amended Motion for Preliminary Injunction was filed on April

---

[1] Count 2, a deliberate indifference claim against Dr. Michael Scott, was recently dismissed without prejudice for failure to exhaust administrative remedies (Doc. 174).

20, 2018 (Doc. 144). With his Second Amended Motion for Preliminary Injunction, Abdullah asks the Court to enter a preliminary injunction requiring the IDOC and the Warden of Dixon Correctional Center to:[2]

1. Provide him with telescopic eyeglasses and other assistive devices, as prescribed by the low-vision specialist and later approved by Medical Director Dr. Zahtz;

2. Provide him with regular access to a handicap accessible and/or ADA-approved gymnasium, or alternative means to perform doctor-prescribed strengthening exercises for his various medical conditions; and

3. Provide him with a one-man cell assignment, or ADA-compliant cell assignment to ensure his safety, accommodate his disabilities, and prevent significant complications likely to result from his disabilities in the event that his cellmate were to engage in violence or other altercations.

The undersigned held a hearing on March 25, 2019, at which Abdullah appeared and provided testimony (Doc. 174). The following facts are taken from that hearing and from affidavits and other evidence submitted with the parties' briefing.

## FINDINGS OF FACT

Abdullah was diagnosed with rheumatoid arthritis in July 1979 while incarcerated at Stateville Correctional Center (Doc. 86). He subsequently was diagnosed with ankylosing spondylitis, a form of long-term arthritis that causes spinal mobility problems, in October 1979 (*Id.*). Medical providers recommended at that time that Abdullah perform daily exercises, including leg lifts with weights and back

---

[2] Abdullah also asked that the IDOC be ordered to refer him to a rheumatologist and to follow the rheumatologist's recommendations with regard to his medical care. Because there was evidence that Abdullah already had been referred to a rheumatologist at the time he filed his motion, this portion of the motion was denied as moot on March 21, 2019 (Doc. 172).

strengthening exercises at least one hour per day to treat these conditions and prevent and minimize pain and further degeneration stemming from these conditions (*Id.*).

Abdullah has repeatedly asked for access to a handicap-accessible gym or other means to perform the previously recommended exercises for his rheumatoid arthritis and ankylosing spondylosis because he is unable to perform them in the prison yard (*Id.*). He also has asked for a single-cell assignment in order to ambulate safely in his cell and prevent serious injury that would result if his cellmate, whom he can barely see, were to attack him (*Id.*, Doc. 145).

Abdullah was declared legally blind by the IDOC in 1998 as a result of his anterior uveitis, a type of inflammation of the middle layer of the eye (*Id.*). Abdullah also has light phobia caused, he testified, by a steroid drop the IDOC provided that he used for 11 years. This light sensitivity causes everything to look like a white fog. Without the aid of assistive devices, he can barely see and cannot perform basic daily activities (Doc. 145-2). For example, he cannot read and often must have another inmate read letters and other written materials for him (*Id.*). He also testified that he is unable to attend school due to his inability to read or write.[3]

According to Abdullah's testimony, in 2008 he was prescribed telebinocular lenses, tinted glasses, and a hand magnifier by an ophthalmologist at Pinckneyville Correctional Center, but those items were taken from him in 2015. In September 2016,

---

[3] Counsel for the IDOC Defendants argued at the March 25 hearing that Abdullah appeared to be having no issues on the day of the hearing given that he was under a bright light during the video conference. To the contrary, the Court found him to appear strained, obviously unable to see the undersigned or the lawyers who were asking him questions. He constantly squinted and looked down, much like one does when trying to avoid strong sunlight without the benefit of sunglasses or other eye protection.

Abdullah was prescribed photogrey lenses,[4] which were issued to him on October 3, 2016 (Doc. 95-1). Abdullah testified that these lenses are only a 5 percent tint when outdoors, and he needs at least 30 percent tint indoors and 50 percent tint when outdoors.

After being transferred to Dixon in June 2017, Abdullah continued to request the items that were taken from him at Pinckneyville. Abdullah was referred to Dr. John Russell, a low-vision specialist, who recommended on October 5, 2017, that he be given a video magnifier for printed material, 10x binocular lenses for distance viewing, dark-tinted lenses full-time for glare, a walking cane, and an ADA talking watch or clock (Doc. 145-2). Dr. Merrell Zahtz, Dixon's Medical Director, approved and ordered each of these items on October 25, 2017 (*Id.*; Doc. 145-4). To date, however, Abdullah has received only the walking cane, which he received shortly after Dr. Zahtz approved it, and a talking watch, which he did not receive until about November 2018.

Abdullah testified that without the video magnifier he cannot read materials in the law library, religious texts, legal correspondence, or any other books. He also cannot complete any studies offered by Dixon without it. Without the telebinocular lenses, he can see six feet in front of him on a good day; on a bad day, almost nothing. He relies on the line between the grass and the sidewalk to see where to walk outdoors, and he can only see movement on his television if he is one foot away from it. He also injures himself in his cell as a result of not being able to see. He testified that he constantly stubs his toes, hits his shins, and knocks stuff down, which angers his cellmate.

Abdullah further testified that he most recently saw a specialist in January 2019,

---

[4] Based on Abdullah's testimony, Court understands these to be similar to or the same as transition lenses.

Dr. Pearlman at the Hauser-Ross clinic. Dr. Pearlman recommended the same devices as those recommended by Dr. Russell, and again Dr. Zahtz approved the recommendations. Unfortunately, however, to date, he still has not received the recommended visual aids.

**LEGAL STANDARD**

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R Miller, & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE §2948 (5th ed. 1995)). The purpose an injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). A plaintiff has the burden of demonstrating he (1) has a reasonable likelihood of success on the merits; (2) has no adequate remedy at law; and (3) will suffer irreparable harm absent the injunction. *Planned Parenthood v. Commissioner of Indiana State Dept. Health*, 699 F.3d 962, 972 (7th Cir. 2012).

As to the first hurdle, the Court must determine whether "plaintiff has any likelihood of success—in other words, a greater than negligible chance of winning." *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). Regarding irreparable harm, this requirement eliminates those cases where, although the ultimate relief sought is equitable, the plaintiff can wait until the end of trial to get that relief. *Id.* Only if the plaintiff will suffer irreparable harm in the interim—that is, before a final judgment—can he obtain a preliminary injunction. *Id.*

Once a plaintiff has met his burden of meeting these three requirements, the Court must weigh "the balance of harm to the parties if the injunction is granted or denied and

also evaluate the effect of an injunction on the public interest." *Id.*; *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte*, 735 F.3d at 665.

The Prison Litigation Reform Act provides that a preliminary injunction in a correctional setting must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). The Court also "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief[.]" 18 U.S.C. § 3626(a)(2).

The Seventh Circuit has described injunctions like the one sought here, requiring an affirmative act by the defendant, as a mandatory preliminary injunction. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Mandatory injunctions are "cautiously viewed and sparingly issued," because they require the court to command a defendant to take a particular action. *Id.* (citing *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978)).

## Discussion

**A.      Reasonable Likelihood of Success on the Merits**

Abdullah argues he is reasonably likely to succeed on the merits of his deliberate indifference claims because the IDOC and Wexford continue to ignore medical recommendations related to his serious medical conditions: rheumatoid arthritis, ankylosing spondylitis, and anterior uveitis.

Regarding his rheumatoid arthritis and ankylosing spondylitis, Abdullah argues that Defendants have ignored prior medical recommendations that he be permitted to

perform leg lifts with weights, back strengthening exercises, and other exercises for at least one hour per day to increase mobility, reduce pain, and prevent future deterioration. Abdullah notes that Dixon does not have an ADA-approved gym, so instead he has requested ankle and wrist weights to perform strengthening exercises in his cell. Yet, Defendants refuse to provide him with a means to perform his prescribed exercises.

Similarly, Defendants have completely ignored the low-vision specialist's recommendation that he receive a video magnifier, 10x binocular lenses, and permanently tinted glasses for his vision problems, items that the prison Medical Director approved and ordered. Instead, he was given only a pair of photogrey lenses, which he testified are insufficient for his needs. Without the prescribed eyeglasses, Abdullah can see only a shadow of an individual walking in front of him, and he is unable to read, study, or perform other daily tasks without significant difficulty.

With regard to his ADA and Rehabilitation Act claims, Abdullah argues he is likely to succeed because each of his conditions qualify as a disability that substantially limits his ability to walk, exercise, shower, and perform other daily functions. Furthermore, it is well-established that showers and gyms, as well as recreational activities, educational programs, and medical services are considered "programs or activities" under the ADA and Rehabilitation Act. Here, Defendants have repeatedly denied Abdullah access to multiple prison facilities and programs by failing to accommodate his disabilities.

In response, Defendants Dr. Vipin Shah and Wexford Health Sources, Inc. ("the Wexford Defendants") argue that Abdullah is not likely to succeed on the merits of his deliberate indifference claim as to his vision issues. They assert that Wexford approved

his request to see a low-vision specialist and submitted the approval to the IDOC. Furthermore, while Abdullah may desire specific devices, he is not entitled to the care of his choice.

The IDOC Defendants also argue that Abdullah is not likely to succeed on the merits of his deliberate indifference claim because he has had extensive and timely medical care at Dixon (Doc. 154). The IDOC Defendants note that Abdullah received new photogrey prescription glasses on August 22, 2016, and again on October 3, 2016, and for safety and security reasons, inmates are prohibited from possessing computer monitors, cameras, and other visual aids, as those items and their components can be used to harm both inmates and staff.

With regard to his ADA and Rehabilitation Act claims, the IDOC Defendants argue that Abdullah has not shown he has been discriminated against because of his disability. While he claims he needs special accommodations for the possibility of future harm, he has failed to demonstrate that he has been excluded from a prison service, program, or activity because of one of his disabilities. Instead, his claims are grounded in allegations of inadequate and incomplete medical service, and "the ADA does not create a remedy for medical malpractice." Finally, the IDOC Defendants argue, Abdullah fails to demonstrate how his two-man cell constitutes a "service, program or activity" within the meaning of the ADA.

    i.    *Deliberate Indifference*

To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must show first that his condition was "objectively, sufficiently serious" and second that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414

F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985).

Here, Abdullah has demonstrated a greater than negligible chance of success on the merits of his deliberate indifference claim against the IDOC Defendants with regard to his rheumatoid arthritis and ankylosing spondylitis—conditions the Court finds to be objectively serious. Abdullah testified that IDOC medical providers recommended he perform daily exercises, including leg lifts with weights and back strengthening exercises at least one hour per day to treat these conditions and prevent and minimize pain and further degeneration stemming from these conditions. Yet, he has no means of performing these exercises when he cannot see well enough to go to yard or gym with general population and when Defendants refuse to give him hand or ankle weights. Defendants have not rebutted this testimony with any evidence that the medical recommendations—while dated—are not still applicable today. Thus, a jury could find the IDOC Defendants to be deliberately indifferent to his rheumatoid arthritis and ankylosing spondylitis.

Abdullah also has shown a reasonable likelihood of success on the merits of his deliberate indifference claim against the IDOC Defendants with regard to his vision issues. Abdullah has documented vision impairments and has been declared legally blind; thus, the Court finds his anterior uveitis to be objectively, sufficiently serious. Further, the IDOC Defendants are fully aware of his condition, that a low-vision specialist

has prescribed[5] specific assistive devices, and that Medical Director Dr. Zahtz has approved and ordered the devices. The IDOC simply refuses to provide them.

The IDOC argues that video magnifiers are prohibited for security reasons, citing to ADA coordinator Maxwell Blackburn's testimony before Judge Wilkerson (Doc. 138). But Mr. Blackburn testified that he only deals with accommodations under the ADA, not medical prescriptions, and he could not speak to whether a device would be denied when it is medically prescribed (*Id.*, pp. 47-48). And the IDOC has not presented any safety regulations or other evidence to support its position that a video magnifier poses a safety risk when it is medically prescribed. Moreover, even if a video magnifier is a security concern, the IDOC has provided no reason whatsoever for failing to give Abdullah the 10x binocular lenses for distance viewing or permanently dark-tinted lenses for glare. Under these circumstances, there is a reasonable likelihood that a jury would find the IDOC Defendants deliberately indifferent to Abdullah's serious medical needs.

The same cannot be said, however, for Wexford. Blackburn testified that when a device is prescribed to an inmate, it goes through Wexford's collegial process, central supply orders the item, and then the assistant warden of programs decides whether it is appropriate for the facility (*Id.*). In this case, Wexford approved the referral for Abdullah to see a low-vision specialist. Dr. Zahtz, who is employed by Wexford, testified that he approved the specialist's recommendations and ordered the devices from central supply (*Id.*, p. 26). Because Wexford took action with regard to Abdullah's visual needs, at this

---

[5] The Court notes there is some discrepancy between whether the devices were "prescribed" or just "recommended." Throughout his briefing, Abdullah refers to the devices as having been "prescribed," and Defendants do not dispute this characterization. Accordingly, the Court finds that the devices were indeed medically prescribed.

point Abdullah does not have a reasonable likelihood of success on his deliberate indifference claim against Wexford.

    ii.       *ADA and Rehabilitation Act*

Title II of the ADA provides that "no qualified individual with a disability shall, because of that disability . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2006). "In the prison context, a plaintiff can make out a prima facie case of discrimination under both the ADA . . . by showing: (1) he is a qualified person; (2) with a disability; (3) the Department of Corrections denied him access to a program or activity because of his disability or otherwise subjected him to discrimination; and (4) the denial or discrimination was by reason of his disability." *Farris v. Kurr*, No. 16-CV-272-SMY-RJD, 2018 WL 3036130, at *3 (S.D. Ill. June 19, 2018) (citing *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012)). A plaintiff can demonstrate discrimination on the basis of disability by a defendant's refusal to make a reasonable accommodation. *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 848 (7th Cir. 1999)

The Court agrees with Abdullah that each of his conditions qualifies as a disability, that he has been denied access to a program or activity because of his disability (exercise, reading, and schooling), and the IDOC has refused to make a reasonable accommodation—whether by providing the devices to assist his vision or providing a one-man or ADA-compliant cell. Accordingly, the Court finds that he has more than a negligible chance of success on this claim.

## B. No Adequate Remedy at Law and Irreparable Harm

The Court quickly disposes of the requirement of no adequate remedy at law, for no money judgment could remedy Abdullah's ability to see or prevent his physical health from deteriorating sooner. Accordingly, that element is met.

As for irreparable harm, Abdullah argues that in the absence of a preliminary injunction he will continue to experience unnecessary pain and suffering. Without access to ankle and wrist weights in his cell to exercise as recommended, there is a reasonable likelihood that his conditions will progress at faster rates, his mobility will become more restricted, and his resulting pain will continue to increase. Furthermore, without his previously prescribed eyeglasses and other recommended visual aids, Abdullah will continue to be able to see little more than a shadow and will be unable to participate in educational programs at Dixon, or to read, write, shower, or even walk without significant difficulty. And, if not transferred to a single cell or ADA-compliant two-man cell, he will be at risk of serious injury because he is unable to defend himself in an altercation.

In response, the Wexford Defendants note that Abdullah has received various assistive devices, including numerous pairs of glasses and a cane. Therefore, he will not suffer irreparable harm absent an injunction prior to trial. The IDOC Defendants also argue there is no irreparable harm where the hardships Abdullah complains of are merely speculative.

With regard to the IDOC's failure to provide the recommended visual aids, the irreparable harm to Abdullah is obvious. Each and every day the IDOC refuses to provide him—a legally blind inmate—with visual aids that have been recommended and

approved, he is prevented from seeing, reading, writing, studying, going to school, going to yard, and even showering without significant difficulty. Moreover, "a constitutional violation, like the one alleged here, is indeed irreparable harm for purposes of preliminary injunctive relief." *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1028 (S.D. Ind. 2014) (citing *Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir. 1978)). Accordingly, the Court finds that Abdullah has demonstrated irreparable harm with regard to the IDOC's refusal to provide the recommended visual devices.

The Court agrees with the IDOC Defendants, however, that Abdullah's requests for hand and ankle weights to prevent his rheumatoid arthritis and ankylosing spondylitis from worsening is not proof of irreparable harm, as the harm is speculative. Abdullah has presented no evidence that the failure to obtain hand these weights, prior to a trial on the merits, will certainly cause his conditions to deteriorate.

Similarly, Abdullah has not shown irreparable harm with regard to his request for a single cell or ADA-compliant two-man cell. His complaint that he is at risk of serious injury because he is unable to defend himself from altercation with his cellmate is speculative at best. Moreover, he testified at the hearing that he generally gets along with his cellmate, his cellmate reads his mail for him and helps him with various tasks, and there has been no altercation between them in the past year and a half. To the extent he has injured himself in his cell, the only evidence presented is that he has stubbed his toe and bumped his shins. The Court does not find these injuries to demonstrate irreparable harm.

## C. Balance of Harms and Public Interest

Having found that Abdullah has met his burden with regard to his request for the visual aids recommended by the low-vision specialist and ordered by Dr. Zahtz, the Court now turns to the balancing phase, in which the Court must choose the course of action that minimizes the costs of being mistaken. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008). In doing so, the Court must compare "the potential irreparable harms faced by both parties to the suit—the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted." *Id.* The more likely it is that Abdullah will win his case on the merits, the less the balance of harms need weigh in his favor. *Id.*

Here, the balance of harms weighs in Abdullah's favor. Wexford has already approved and submitted an order for his visual aids, presumably meaning they have already been purchased or are in line to be purchased. And the IDOC has presented no evidence that a video magnifier—when medically prescribed—would be automatically refused due to security concerns. On the other hand, the harm to Abdullah includes the ongoing inability to see, read, write, go to school, go to yard, and potential constitutional violations.

It also seems to be in the public interest to provide Abdullah with visual aids that will allow him to participate in life's daily activities. *See Foster v. Ghosh*, 4 F. Supp. 3d 974, 984 (N.D. Ill. 2013) ("Illinois taxpayers have a vested interest in ensuring that the constitutional rights of its citizens are protected."). Giving Abdullah devices that allow him to see may even alleviate his desire for a one-man cell or special exercise equipment,

as he would be able to see his way around his cell and potentially even exercise on the yard or at the gym, thereby saving taxpayers money.[6] Thus, the Court finds that ordering Defendants to provide Abdullah with his prescribed devices will not harm but rather benefit the public interest.

**D.     Security Concerns**

Having met the requirements for a preliminary injunction, the Court finds that the IDOC Defendants should be ordered to provide Abdullah with the visual aids he has not yet received, namely: a video magnifier for printed material, 10x binocular lenses for distance viewing, and dark-tinted lenses full-time for glare.

The Court recognizes, however, that a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Furthermore, the Court does not seek to take away the IDOC Defendants' discretion in making facility-related security determinations. *See Woodley v. Baldwin*, No. 18 CV 50050, 2018 WL 3354915, at *10 (N.D. Ill. June 14, 2018), report and recommendation adopted, No. 18 CV 50050, 2018 WL 3344593 (N.D. Ill. July 9, 2018). Accordingly, once the video magnifier is acquired, the IDOC shall determine whether it poses a security concern. If it does, both Abdullah and the Court shall be provided with a written explanation and an indication as to whether an alternative magnifying device is available for Abdullah to read printed material.

---

[6] Of course, the Court will continue to monitor whether the issues related to his inability to exercise are resolved by corrective eyewear and will remain open to revisiting this issue as the case progresses.

CONCLUSION

For these reasons, the Second Amended Motion for Preliminary Injunction (Doc. 144) is **GRANTED in part and DENIED in part**. The IDOC Defendants are **ORDERED** to provide Plaintiff Salik Abdullah with 10x binocular lenses, permanently dark-tinted lenses, and—to the extent it does not raise a security concern—a video magnifier, within **14 days** of the date of this Order (on or before **April 10, 2019**). If the magnifier does present a security concern, the IDOC Defendants are **ORDERED** to explain that to Abdullah and the Court, in writing, as well as detail the availability of any alternative devices.

**IT IS SO ORDERED.**

DATED: March 27, 2019

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**